**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

BLUE RIDGE ENVIRONMENTAL
DEFENSE LEAGUE, et al.,

                Plaintiffs,

                Case No. 16-cv-00364 (CRC)

        v.

SCOTT PRUITT,

                Defendant.

---

## MEMORANDUM OPINION

The Clean Air Act requires the Environmental Protection Agency to promulgate national emission standards for sources of hazardous air pollutants. These standards must reflect the maximum degree of reduction in emissions that the EPA determines is achievable. But because technological advancements often enable regulated entities to comply with more rigorous emission standards over time, the statute requires the EPA to "review, and revise [these standards] as necessary" every eight years. 42 U.S.C. § 7412(d). Additionally, the Act requires the EPA to consider any residual risk to public health that remains even after these technology-based emission standards have been implemented, and to promulgate additional standards to protect the public, if necessary. § 7412(f). The EPA typically performs its obligations under § 7412(d) and § 7412(f) in a single rulemaking called a Risk and Technology Review ("RTR").

Four environmental advocacy groups have filed suit against the EPA alleging that it has failed to abide by these statutory responsibilities with respect to 13 sources of hazardous air pollutants. The EPA admits as much. Thus, the only issue before the Court at summary judgment is how quickly it should order the EPA to comply with the Act's mandatory deadlines. Each side has submitted a proposal that it claims represents the most expeditious schedule

possible.  After carefully reviewing each proposal and the materials in the record, the Court will

order a compliance schedule that is more relaxed than that proposed by Plaintiffs, but more

expedited than that sought by the EPA.

I.      **Background**

A.  Statutory Framework

Congress enacted the Clean Air Act in 1963 "to protect and enhance the quality of the

Nation's resources so as to promote the public health and welfare and the productive capacity of

its citizens."  42 U.S.C. § 7401, et seq.  Notwithstanding major amendments to the law in 1970

and 1977, its framework for protecting the public from hazardous air pollutants remained weak.

As Congress considered further amendments to the Clean Air Act in 1989, the Senate Committee

on Environment and Public Works acknowledged that "[t]he law has worked poorly" and that the

EPA had failed to protect the public from harmful pollutants.  See S. Rep. No 101–228, at 128

(1989) ("In 18 years, [the] EPA has regulated only some sources of only seven [hazardous air

pollutants]."); see also H.R. Rep. 101-490(I) (noting that the seven hazardous air pollutants

regulated by the EPA at the time were "only a small fraction of the many substances associated

(at some level of concentration) with cancer, birth defects, neurological damage, or other serious

health impacts").

The following year, the Clean Air Act Amendments of 1990 passed the Senate by a vote

of 89 to 11, and were signed into law by President George H. W. Bush.  See Clean Air Act

Amendments of 1990, U.S. Congress, http://www.congress.gov/bill/101st-congress/senate-

bill/1630.  The Amendments were "sweeping," and drastically expanded the EPA's role in

regulating interstate pollution.  See Sierra Club v. Johnson, 444 F. Supp. 2d 46, 48 (D.D.C.

2006).  They created "an aggressive regime of new control requirements to address four crucially

important air pollution problems: urban smog, hazardous air pollution, acid rain, and depletion of the stratospheric ozone layer." California Communities against Toxics, et al. v. Pruitt, 2017 WL 978974, at *1 (D.D.C. Mar. 13, 2017) ("California Communities") (citing Hon. Henry A. Waxman, An Overview of the Clean Air Act Amendments of 1990, 21 Envtl. L. 1721, 1723 (1991)).

The 1990 Amendments require the EPA to reduce hazardous air pollutants by regulating the sources that emit them, such as stationary turbines for fuel combustion, oil refineries, and sewage incineration facilities, to name a few. See Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 31576-01 (1992).[1] Specifically, the Amendments required the EPA to promulgate emission standards for each source category, and to revise these standards every eight years in light of improvements in pollution control technology. See 42 U.S.C. § 7412(d)(6). The Amendments also require the EPA to consider any residual risk to public health that remains after it implements these emission standards, and to implement additional standards to protect the public, if necessary. See § 7412(f)(2). The EPA's practice has been to combine its technology-based obligations under § 7412(d)(6) and its residual-risk obligations under § 7412(f)(2) in a single rulemaking called a Risk and Technology Review. Def.'s Cross-Mot. Summ. J. ("Cross-MSJ") 6. Since Congress imposed these obligations on the EPA in 1990, stationary sources of air pollution in the United States have emitted about 1.5 million fewer tons of pollution per year. See Detailed Summary: Clean Air Act Results, Environmental Protection Agency, http://www.epa.gov/clean-air-act-overview/progress-cleaning-air-and-improving-peoples-health; see also id. (noting that since

---

[1] For additional background information on how the source categories are determined, see California Communities, 2017 WL 978974 at *1.

1990, "national concentrations of air pollutants improved 85 percent for lead and 84 percent for

carbon monoxide," and that reductions in air pollution over the past several decades have

increased the average life expectancy in U.S. cities by approximately seven months).

> B.  Plaintiffs' Suit

Plaintiffs allege that the EPA has failed to meet the following statutory deadlines for

conducting RTRs with respect to 13 source categories of hazardous air pollutants:

| Source Category | Date of Promulgation of Emission Standard | Deadline for § 7412(d)(6) and § 7412(f)(2) Rulemakings |
|---|---|---|
| 1.  Leather Finishing Operations | Feb. 27, 2002 | Feb. 27, 2010 |
| 2.  Wet-Formed Fiberglass Mat Production | Apr. 11, 2002 | Apr. 11, 2010 |
| 3.  Rubber Tire Manufacturing | July 9, 2002 | July 9, 2010 |
| 4.  Surface Coating of Large Appliances | July 23, 2002 | July 23, 2010 |
| 5.  Friction Materials Manufacturing Facilities | Oct. 18, 2002 | Oct. 18, 2010 |
| 6.  Surface Coating of Metal Furniture | May 23, 2003 | May 23, 2011 |
| 7.  Surface Coating of Wood Building Products | May 28, 2003 | May 28, 2011 |
| 8.  Printing, Coating, and Dyeing of Fabrics and Other Textiles | May 29, 2003 | May 29, 2011 |
| 9.  Taconite Iron Ore Processing | Oct. 30, 2003 | Oct. 30, 2011 |
| 10. Miscellaneous Coating Manufacturing | Dec. 11, 2003 | Dec. 11, 2011 |
| 11. Lime Manufacturing Plants | Jan. 5, 2004 | Jan. 5, 2012 |
| 12. Iron and Steel Foundries | Apr. 22, 2004 | Apr. 22, 2012 |
| 13. Plywood and Composite Wood Products | July 30, 2004 | July 30, 2012 |

Pls.' Mot. Summ. J. ("MSJ"), Table B, 9–10.  The parties agree that eight years have passed

since the promulgation of emission standards for each of the above source categories, and that

the EPA has failed to complete the rulemakings required to update the standards under

§ 7412(d)(6) and § 7412(f)(2).  See Pls.' MSJ 1; Def.'s Statement of Facts ("SOF") ¶¶ 1–8.

C.  Proposed Remedies

Both parties have proposed remedial schedules, discussed below, that provide a deadline

by which the RTR for each source category is to be completed.

1.  *Plaintiffs' Proposed Remedial Schedule*

Plaintiffs have proposed a remedial schedule that would require the EPA to promulgate

final rules for all of the overdue source categories within 2 years.  Specifically, Plaintiffs would

have the EPA "issue notices of proposed rules for 7 of the overdue source categories within 8

months of the Court's order, and promulgate final rules within 1 year."  Pls.' MSJ 18–19.  For

the remaining 6 overdue source categories, Plaintiffs would have the EPA "issue notices of

proposed rules within 20 months of the Court's order, and promulgate final rules within 2 years."

Id.

2.  *EPA's Proposed Remedial Schedule*

The EPA, on the other hand, has proposed a remedial schedule that would require it to

promulgate final rules for all of the overdue source categories within the next 4 and a half years.

Specifically, the EPA has staggered its proposed deadlines for each source category as follows:

| Source Category | Proposal Date | Final Rule Date |
|---|---|---|
| 1.  Printing, Coating, and Dyeing of Fabrics and Other Textiles | Jan. 17, 2018 | Jan. 15, 2019 |
| 2.  Surface Coating of Metal Furniture | Feb. 15, 2018 | Feb. 12, 2019 |
| 3.  Surface Coating of Large Appliances | Mar. 15, 2018 | Mar. 12, 2019 |
| 4.  Leather Finishing Operations | Mar. 22, 2018 | Mar. 19, 2019 |
| 5.  Surface Coating of Wood Building Products | Apr. 17, 2018 | June 11, 2019 |
| 6.  Friction Materials Manufacturing Facilities | Jul. 31, 2018 | July 25, 2019 |
| 7.  Rubber Tire Manufacturing | Jan. 22, 2019 | Mar. 17, 2020 |
| 8.  Wet-Formed Fiberglass Mat Production | Sep. 17, 2019 | Sep. 9, 2020 |
| 9.  Taconite Iron Ore Processing | Oct. 3, 2019 | Oct. 27, 2020 |
| 10. Lime Manufacturing Plants | Oct. 29, 2019 | Dec. 15, 2020 |
| 11. Iron and Steel Foundries | Dec. 12, 2019 | Apr. 6, 2020 |

| 12. Plywood and Composite Wood Products | Jan. 28, 2020 | May 20, 2021 |
| 13. Miscellaneous Coating Manufacturing | June 17, 2020 | Oct. 13, 2021 |

See Def.'s Cross-MSJ, Table A, 10.

In support of its proposed schedule, the EPA has submitted a declaration from Panagiotis Tsirigotis, Director of the Sector Policies Programs Division within the agency's Office of Air Quality Planning Standards.  See Def.'s Cross-MSJ, Ex. A ("Decl. of Panagiotis Tsirigotis"). Mr. Tsirigotis asserts that the RTR rulemaking process can be divided into 9 phases, and has provided estimates of the minimum amount of time the EPA needs to complete each phase.  Id. at ¶ 11.  In Phase I (2 months), the EPA establishes a project team, determines whether it will need to hire contractors, and identifies potential stakeholders (such as regulated entities and public interest groups) that may be interested in the rule development.  Id. at ¶ 12.  In Phase II (3 months), it compiles background information and data about the relevant source categories.  Id. at ¶ 13.  In Phase III (0 to 28 months), the agency compiles supplemental information from entities in each source category, if necessary.  If the agency sends a request for supplemental information to more than 10 entities in any source category, it maintains it must obtain approval from the Office of Management and Budget, which could require "a significant amount of additional time."  Id. at ¶ 14.

In Phase IV (3 to 4 months), the EPA turns to the more substantive aspect of the RTR rulemaking process by developing a detailed modeling file that provides required inputs to various risk models.  These inputs include emissions values for each pollutant.  Id. at ¶ 15.  In Phase V (2 to 6 months), the EPA conducts the bulk of its analytic work by assessing residual risk and advancements in emission control technology.  This includes conducting risk assessments from chronic inhalation of each pollutant and ingestion of food contaminated with

each pollutant, and evaluating the performance of control technologies and other emission reduction measures that have been implemented since the original emission standards for each source category were finalized.  Id. at ¶ 16.  In Phase VI (3 months), the EPA begins to develop its proposed rule package, which involves drafting technical memoranda and the rules themselves, and reviewing the rules with EPA management and, in most cases, the Office of Management and Budget.  Id. at ¶ 17.  In Phase VII (3 months), the EPA publishes the proposed rule in the Federal Register and commences the public comment period.  Id. at ¶ 18.  In Phase VIII (3 to 5 months), it reviews, summarizes, and responds to the public comments it has received.  Id. at ¶ 19.   Finally, in Phase IX (3 to 4 months), the EPA develops the final rule package.  Id. at ¶ 20.

## II.    Legal Standard

### A.  Summary Judgment

Federal Rule of Civil Procedure 56 requires the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the outcome of litigation.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.  A party moving for summary judgment may support the motion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [and] interrogatory answers."  Fed. R. Civ. P. 56(c).

B.  Remedies for a Clean Air Act Violation

The Clean Air Act provides that "[t]he district courts of the United States shall have jurisdiction to compel [nondiscretionary] agency action unreasonably delayed."  42 U.S.C. § 7604(a).  The D.C. Circuit has held that this provision permits district courts to exercise their equity powers "to set enforceable deadlines both of an ultimate and an intermediate nature." NRDC v. Train, 510 F.2d 692, 705 (D.C. Cir. 1974).  While district courts have broad discretion to set deadlines for compliance, "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him to do an impossibility."  Id. at 713 (internal quotation omitted).

That being said, an agency has a "heavy burden" to demonstrate that a remedial timeline poses "an impossibility."  California Communities, 2017 WL 978974 at *4 (quoting Alabama Power Co. v. Costle, 636 F.2d 323, 359 (D.C. Cir. 1979)).  This burden is "especially heavy where the agency has failed to demonstrate any diligence whatsoever in discharging its statutory duty to promulgate regulations and has in fact ignored that duty for several years."  Sierra Club v. Johnson, 444 F. Supp. 2d 46, 53 (D.D.C. 2006).  Thus, district courts "must scrutinize carefully claims of impossibility, and 'separate justifications grounded in the purposes of the Act from the footdragging efforts of a delinquent agency.'"  Id. at 58 (quoting Train, 510 F.2d at 713).  Additionally, courts should be wary of agency arguments that more time is needed to improve the quality or soundness of the regulations to be enacted.  Id. at 53.  And if the EPA finds the schedule set by the Clean Air Act to be unreasonable, the agency's remedy lies with Congress, not with the courts.  Id.

### III.    Discussion

Plaintiffs first argue that their proposed schedule, which would require the EPA to complete the RTRs for all source categories within two years, represents the most expeditious possible schedule because that is the time frame contemplated by the Clean Air Act itself.  Pls.' Reply MSJ 6.  When Congress enacted the 1990 Amendments, it required the EPA to promulgate regulations establishing emission standards for 40 source categories in only two years.  See 42 U.S.C. § 7412(e)(1)(A).  The EPA counters by asserting that there are important analytical differences between promulgating initial emission standards and promulgating RTRs.  Def.'s Reply MSJ 6–7.  The agency further points out that while Congress required the EPA to set initial emission standards for 40 source categories in two years, it provided an eight-year window to promulgate RTRs.  Id. at 5–6.

With respect to the EPA's first counterargument, the Court defers to the agency's assessment of the technical nuances involved in promulgating these different types of rules.  But the Court disagrees with the agency's statutory argument.  For one thing, the Clean Air Act's eight-year deadline has less to do with the difficulty in promulgating RTRs and more to do with Congress's expectation that the EPA evaluate the effectiveness of emission standards and changes in pollution control technology *over time*.  See California Communities, 2017 WL 978974 at *5 ("[I]f the RTRs were begun immediately after the completion of the most recent set of RTRs, they would be futile, as there would not yet be developments in technology.").  For another, the text of § 7412 does not contemplate that RTRs take will eight years to promulgate.  Rather, § 7412 provides that RTRs must *occur* at least once every eight years.  See § 7412(d)(6) ("The Administrator shall review, and revise as necessary . . . emission standards promulgated

under this section no less often than every 8 years."). Frequency and duration are two different things.

The parties also spar over the reasonableness of the EPA's proposed schedule, with Plaintiffs asserting that the agency has vastly overestimated the time it needs to complete each phase. Plaintiffs first argue that Phases I and II (project kickoff and preliminary information collection) are nearly complete already. See Pl.'s Reply MSJ 18. While the EPA admits that it has completed at least some of the tasks under Phases I and II, it insists that much more work remains in these two initial phases. See Def.'s Reply MSJ 16–17. Plaintiffs next contend that the estimate for Phase III (supplemental information collection), which the EPA claims could take nearly two years for some of the source categories, is purely speculative because the agency will not know if supplemental information is necessary until it completes Phase II—a point the EPA does not appear to dispute. Id. at 18–22; see generally Def.'s Reply MSJ. Plaintiffs argue that the EPA's estimates for the remaining phases are inflated and do not take into account the agency's ability to address multiple phases concurrently. Pls.' Reply MSJ 22–23. For example, Plaintiffs point to Mr. Tsirigotis's declaration in another case where he estimated that it would take the agency 8 months to complete Phases VII through IX, which they say conflicts with his estimate of about 16 months in the present case. See Def.'s Reply to Mot. to Enter Consent Decree, Decl. of Panagiotis Tsirigotis, American Nurses Ass'n et al. v. Jackson et al., 08-cv-2198 (D.D.C. Mar. 19, 2010) ("We have completed other rules where we had 8 months or fewer between proposal and promulgation."). The EPA attempts to distinguish American Nurses Ass'n and similar cases by pointing out that they concerned fewer RTRs, see Def.'s Reply MSJ 18–19, and that a more expeditious schedule would undermine the quality of the RTRs, id. at 2.

The EPA is undoubtedly correct that the number of RTRs on its plate will in some respect affect the duration of any particular review even if much of the work is performed by outside contractors.  Yet, the Clean Air Act makes clear that Congress contemplated that the EPA could promulgate dozens of air toxics rules in a condensed amount of time.  See § 7412(e)(1)(A).  And if the agency finds this expectation to be unreasonable, its ultimate remedy lies with Congress, not the courts.  See Sierra Club v. Johnson, 444 F. Supp. 2d 46, 57 (D.D.C. 2006).  Moreover, while the Court agrees with the EPA that more time should result in higher quality RTRs, the standard that the Court must consider in ordering a remedial schedule is "impossibility."  See California Communities, 2017 WL 978974 at *5; see also Sierra Club v. Ruckelshaus, 602 F. Supp. 892 (N.D. Cal. 1984) (noting that, given the "impossibility" standard, it is insufficient for an agency to argue that "further study always makes everything better").

Finally, the parties dispute the impact of the agency's staffing levels on its ability to comply with an expeditious remedial schedule.  In response to an Order from the Court, the EPA submitted a supplemental declaration from Mr. Tsirigotis that details the work and staffing of the division responsible for promulgating the RTRs, the Sector Policies and Programs Division ("SPPD").  See Second Decl. of Panagiotis Tsirigotis ("Second Decl.") (ECF No. 34).[2] Tsirigotis attests that there are currently 79 employees in SPPD who work on RTRs, and asserts that "the statutory requirements simply cannot be met given the size of the organization" and SPPD's competing responsibilities.  Id. at ¶ 4.  Plaintiffs respond that 19 of these employees are working at least partially on discretionary matters, and that SPPD can thus comply with an expedited schedule by re-allocating its resources.  See Pls.' Response to Second Decl. 4 (ECF

---

[2] SPPD is a division within the Office of Air Quality Planning and Standards (OAQPS), which in turn is a component of the EPA's Office of Air and Radiation.  Second Decl. of Panagiotis Tsirigotis at ¶ 2, ECF No. 34.

No. 35) (citing Second Decl. at ¶ 13 ("In addition to the activities described above that are prescribed by the statute or that are related to actions prescribed by the statute, SPPD does perform discretionary actions . . . . Overall, an estimated 19 SPPD staff (full-time equivalents) work on these [discretionary] projects and activities.")).

The EPA's concern over its current (and future) availability of resources to complete the required RTRs is understandable.  Staffing and funding constraints are surely relevant in fashioning an appropriate remedy.  Much more important, however, is the unambiguous command from a sweeping bipartisan majority in Congress that the EPA act diligently to limit the public's exposure to hazardous air pollutants.  Balancing all of the competing factors, the Court finds that the EPA has not met its heavy burden to show that a more expedited schedule than the one it proposes amounts to an "impossibility."  But, like other courts in this district, the Court is concerned that the remedial deadlines proposed by Plaintiffs are "simply too compressed at this stage to afford any reasonable possibility of compliance," California Communities, 2017 WL 978974 at *6 (quoting Sierra Club, 444 F. Supp. 2d at 58), especially in light of Judge Chutkan's recent order to complete 20 RTRs within 3 years.  Therefore, the Court will order a remedial schedule that is more relaxed than that sought by Plaintiffs, but more expedited than that sought by the EPA.  Because Plaintiffs demurred on the question of the relative importance of each source category, see Hr'g Tr. 25:5–25:21, the Court will decline to order specific deadlines for each RTR and will defer to the EPA on which ones to prioritize.  The Court will, however, order the EPA to complete RTRs for at least 7 overdue source categories by December 31, 2018, and to complete the remaining 6 RTRs by June 30, 2020.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' Motion

for Summary Judgment, and deny Defendant's Motion for Summary Judgment.

A separate Order will accompany this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  March 22, 2017